UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ENRIQUE AMAYA,

    Defendant.
_____/

CRIM. CASE NO. 10-20338-D2

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

ORDER
(1) DENYING DEFENDANT AMAYA'S MOTION TO
SUPPRESS EVIDENCE RE: 53 WEST COLUMBIA (Doc #214)
(2) DENYING DEFENDANT AMAYA'S MOTION TO
SUPPRESS EVIDENCE RE: 411 WOODLAKE LANE (Doc #216)

On February 14, 2012, Defendant Amaya filed the two above-styled Motions to Suppress. On March 6, 2012, the Government filed a combined response to both motions. On March 12, 2012, Defendant filed a reply to the Government's combined response. On March 29, 2012, the Court heard oral argument on Amaya's two motions to suppress.

The Court, for the reasons stated below, denies both of Defendant's motions to suppress.

I.     THE AFFIDAVIT

A single affidavit signed by DEA Special Agent Marwan Kassar was used in support of a single search warrant authorizing the search of both locations. The search warrant was authorized by U.S. Magistrate Judge Mona Majzoub on June 2, 2010.

The affidavit recited the following pertinent facts with regard to the underlying

1

investigation:

1. That the Court had authorized a Title III intercept on Defendant Amaya's telephone.

2. That the monitoring of that intercept revealed a number of communications related to illegal drug trafficking.

3. That in an intercept on May 29, 2010, Amaya stated that he had a job for the other conversant to take a guy to Colorado, that the driver's costs would be paid for two or three days, along with $1000. The other conversant, noted that with Michigan license plates on the car, the car would "be very hot" driving the trip. That other conversant then said he'd make a call, and call Amaya back. Fifteen minutes later, that other conversant called Amaya back to confirm that he had "found a girl to go, along with her sister." Amaya then told that conversant that the guy being driven "won't tell her anything."

4. The affiant, an experienced DEA agent, who had been involved in many drug transactions believed, based on his training and experience, that Defendant Amaya was procuring couriers to go outside Detroit to obtain or deliver drugs, and that was why the intercepted conversation noted the "hot" Michigan license plates being likely to attract law enforcement officer on the trip.

5. A few hours later the intercept captured Amaya asking that conversant whether the "dude" is ready to go, and to meet a burgundy colored car at the church across from Amaya's house at 53 West Columbia, Pontiac, MI.

6. On May 29, 2010, Agents surveilled the 53 West Columbia area and saw an unidentified male and two females depart in a maroon Pontiac Grand Prix. The male was referred to by Amaya as "Crimen", who agents have identified as Franklin Gonzalo

Sierra-Rodriguez based on monitored phone conversations between Amaya and his associates.

7. On June 1, 2010, DEA Special Agent Michael Jeneary was informed by Colorado law enforcement officers that Joaquin Lucero Carillo was murdered in the early morning hours in Littleton, CO; that a vehicle registered to Jesus Medina-Meraz was located at the homicide site, and that Medina-Meraz, who was listed as an emergency contact on Carillo's lease, was a suspected drug trafficking co-conspirator of Amaya based on a surveilled suspected hand-to-hand drug transaction between the two in December 2009 in Pontiac, MI.

8. The affiant also knew through GPS ping information that Sierra-Rodriguez and the two unidentified females were in the Littleton Colorado area from May 30, 2010 through the early morning hours of June 1, 2010.

9. That eyewitnesses at the time of the murder saw a Hispanic male depart the homicide scene in a dark Grand Am.

10. Agents knew, based on GPS ping information on Sierra-Rodriguez' phone, that the phone subscriber was Frankin-Sierra at P.O. Box 54988, Irvine CA, suspected to be a fictitious name and address, using Sprint's Corporate address, and that he was in the vicinity of the homicide scene at the time of the murder.

11. On June 1, 2010, an intercept of Amaya's phone learned that the car containing Sierra-Rodriguez had gotten lost in Kansas or Arkansas; Amaya stated: "The three of them are on their way back."

12. Later that day, an Amaya intercept heard him say "I provoked it, but . . . at same time,

I felt bad. . . . I sent the guy . . . . It took us a long time of planning it well. . . . [H]e just said he was waiting for him outside all day yesterday. He comes out. He came out of the apartment so he knocked on the door and he opened and he put holes in him. At . . . he called me at 3 in the morning . . . and he told me it's done. The tree fell." The affiant concluded that Amaya is discussing the murder of Carillo, and Amaya's role and the roles of Sierra-Rodriguez and the two unidentified females.

13. The affidavit then proceeds to set forth the two locations that were to be subject to the instant search warrant, and how the drug trafficking investigation of Amaya beginning in October 2009, through June 2, 2010, and the previously noted murder investigation in the warrant, provided probable cause to search the Columbia and Woodlake locations.

II. <u>53 WEST COLUMBIA AVE, PONTIAC, MI</u>

As to 53 West Columbia, the affidavit recounts that based on surveillance this appears to be Defendant Amaya's personal residence, owned by a female who agents believe is his wife. Significant is the fact that this address is listed on Amaya's State of Michigan driver's license. Agents also set forth that numerous physical surveillances revealed Amaya's presence there, and his registered trucks presence at different times from November 2009- June 2010. Again, significantly, Amaya's truck is registered to him at this address. Finally, the affidavit reiterates that the Pontiac Grand Am car, with Sierra-Rodriguez and the two females, departed from the vicinity of 53 West Columbia just prior to traveling to Colorado.

The Court concludes that the affidavit establishes robust probable cause to search Amaya's residence for documentary and/or other physical evidence of Amaya's involvement in Carillo's murder and/or narcotics trafficking, including cell phones, text messages, photographs,

address books and phone numbers of criminal associates, weapons, currency, books, journals or ledgers to document sales, receivables, and debts – all likely to be kept at home as well as in the "stash" or "safe" house such as 411 Woodlake Lane, Pontiac.

III. 411 WOODLAKE LANE, PONTIAC, MI

This rental unit, per intercepted phone calls, was rented by Defendant Amaya. In addition, between November 2009 and June 2010, physical surveillance revealed that two of Amaya's vehicles were located in the vicinity of this residence on multiple occasions, as late as 2 a.m, and as early as 9 a.m.

DEA Agents have also seen a 1995 Michigan-plated Mitsubishi Eclipse located at the residence at various hours throughout the day. The agents believe that the owner of this car resides there.

Significantly, on May 29, 2010 the Pontiac Grand Am that went to Colorado later in the day was parked with the two unidentified females inside in the vicinity of 411 Woodlake Lane, next to the aforementioned Mitsubishi. That Grand Am was next seen at 53 West Columbia, from where it left, in tandem with the Mitsubishi.

These facts support the Court's finding of probably cause to search the 411 Woodlake Lane address because it is likely to contain documentary and/or physical evidence relating to the murder of Carillo and narcotics trafficking, in what appears to be a murder connected to drug trafficking. The Court also concludes that there was probable cause to issue a search warrant for this location. The Court finds that relevant evidence likely to be at that address includes cell phones, text messages, photos, cash for the trip, and journals relating to the payments for the trip expenses, payments to the couriers, and to Defendant Sierra-Rodriguez.

5

## IV. THE HEARING: MARCH 29, 2012

At the hearing before the Court on March 29, 2012, the Government conceded that Defendant Amaya has standing to challenge the searches of both the Woodlake and Columbia addresses. The Government also conceded that Defendant Maravillas had standing to contest the search of the Woodlake location.

Counsel for Amaya contended that there was no nexus between either premises and criminal activity.

The Government argued that under the "totality of circumstances" test adopted by the Supreme Court decision in *Illinois v. Gates*, 462 U.S. 213 (1983), the Government noted the following facts:

1. The May 2010 phone call intercepts
2. The surveillance of the burgundy/maroon Pontiac Grand Am at both residences on May 29, 2010
3. The two women leave in the car from the Woodlake address to the Columbia address, to pick up Sierra-Rodriguez, and then from the Columbia address to Colorado.
4. That Pajaro was identified as Defendant Villalon-Espinosa.
5. That Defendant Medina-Meraz was listed as the emergency contact for the victim Carillo in his apartment lease in Littleton, CO.
6. The calls from Amaya to Villalon-Espinosa on June 1, 2010.
7. The connection between the Columbia and Woodlake residences and Amaya.
8. That the murder takes place in the context of drug trafficking activity.
9. Finally, that even if there were not sufficient facts from the totality of the circumstances presented in the affidavit to establish probable cause, that there were sufficient facts – not a bare bones affidavit – to avoid the Fourth Amendment exclusionary rule under *United States v. Leon*, 468 U.S. 897 (1984) because the officers were "acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate."

Defendant Amaya's attorney responded that there was nothing in the affidavit indicating that evidence of a specific crime would be found at either location.

## V. RULING

The Court concludes that the affidavit in support of the search warrant provided sufficient factual evidence to establish probable cause for a search of both locations with regard to the criminal activity specified in the affidavit; conspiracy to travel in interstate commerce with intent to commit the murder of Joaquin Lucero Carillo and/or felony drug trafficking.

The Supreme Court noted in *Illinois v. Gates*, 426 U.S. 213, 244 n.13 (1983):

> [P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands. . . . In making a determination of probable cause the relevant inquiry is not where particular conduct is "innocent" or "guilty", but the degree of suspicion that attributes to particular types of non-criminal acts.

In the instant case, the affidavit demonstrates a connection between the premises to be searched and the evidence sought. *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011). Indeed, the Sixth Circuit noted in *Ellison*, that "a search warrant may be issued on a complaint which does not identify any particular person as the likely offender. . . . [S]earch warrants . . . authorize the search of places and the seizure of things. *Id.* at 350. That connection is established here, to wit, that the residence of Amaya on Columbia Street, and the safe house/stash house on Woodlake Lane would contain evidence relating to the murder allegedly ordered by the Defendant Amaya, and/or his drug trafficking.

Finally, the Sixth Circuit has noted that "Reviewing courts are to accord the magistrate's [probable cause] determination great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th

Cir. 2000) (en banc).

In the instant case Defendant Amaya and some of the co-conspirators either lived at or visited both locations, the Pontiac Grand Am used to transport the two females and the shooter to the murder site was at both locations the day the trip began, and multiple phone conversations between Defendant Amaya and other established involvement in the conspiracy to murder Carillo.

Finally, in the event the affidavit fails to establish Fourth Amendment probable cause, given the detailed facts in the affidavit, this Court would apply the good faith exception to the application of the exclusionary rule as set forth in *United States v. Leon, supra*. This is a very detailed affidavit that was written after extensive investigation and surveillance produced compelling evidence in support of the search warrant for both locations. Clearly, this is not a "bare bones" affidavit.

For the aforementioned reasons, the Court DENIES Defendants' Motions to Suppress Evidence Seized at the Woodlake and Columbia addresses.

SO ORDERED.

DATED: April 2, 2012

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE